EDWARD E. McCABE

v.

JOHN A. SINCLAIR et al.

[Filed February 23d, 1904.]

1. Where, after the formation of a partnership between complainant and defendants, defendants ignored complainant, disavowed the partnership relation and attempted to exclude the complainant from the partnership business, complainant was entitled to sue for an accounting.

2. Complainant and two others agreed to jointly undertake certain public construction work under contract with the board of freeholders of a county, if they could on their bid secure the contract, it being understood that they were to agree on a bid to be made by one of them; that they should see that the board of freeholders found in such one an acceptable bidder, and that they should furnish a share of the cash necessary to launch the enterprise and procure a bond.—*Held*, in a suit by complainant against the others for an accounting, that after the bid had been accepted and a bond furnished there was a partnership, though the contract had never been put in writing, and though complainant had not furnished his share of the cash.

3. After the formation of a partnership between complainant and defendants, defendants ignored complainant, and disavowed the partnership relation and attempted to exclude the complainant from the partnership business; and complainant sued for an accounting, and for the appointment of a manager to supervise the execution of the contract. It appeared that a contract for the construction of certain public work, which enterprise was the subject of the partnership agreement, provided for the retention of twenty per cent. of the contract price until the work was completed, and for the retention of five per cent. of one-fourth of the twenty per cent. for any defects which might be developed in the work, and it was substantially understood that such five per cent. would probably be absorbed for that purpose.—*Held*, that defendants would not be enjoined from receiving payments made in the course of the execution of the contract, but that they would be restrained from anticipating or assigning the final payment of twenty per cent., and would be required to furnish complainant with a list of all payments made by them, and to give complainant information as to the details of the business.

On motion for injunction and receiver. Heard on bill and affidavits and answering affidavits on the part of John A. Sinclair.

*Mr. George G. Tennant,* for the complainant.

*Mr. Joseph M. Noonan,* for the defendant John A. Sinclair.

PITNEY, V. C.

On presentation of this bill to a vice-chancellor an order to show cause was granted, returnable on the 26th of October, 1903, at the chancery chambers in Jersey City. On that day the defendant Sinclair appeared and by consent an order was made postponing the argument until Monday, the 2d day of November, and a partial restraint was made against the defendant Sinclair and the other defendants.

On November 2d the defendants filed the affidavit of John A. Sinclair and leave was granted to the complainant to file affidavits in rebuttal, which was availed of by the filing of certain affidavits on November 4th.

Arguments were had, however, on the second, and I have now to state the result.

The complainant, McCabe, by his bill, claims that he entered into a parol contract of partnership with the defendant Sinclair and the defendant Kennedy for the joint execution of a piece of contract work, viz., the rebuilding of a road, or of a piece of a road, in the county of Hudson, under a contract with the board of freeholders of that county, who where made formal defendants herein. That the contract was taken by previous arrangement in the name of the defendant Sinclair; that the complainant did everything that he agreed to do before and in the letting of the contract and in procuring the security required therefor, and that the defendants then ignored his rights as a partner and excluded him from all participation in the job and disavowed the partnership.

The defendant Sinclair admits the original partnership agreement substantially as stated by complainant, but denies that the complainant performed the preliminary conditions upon which he asserts the agreement of partnership was based, and asserts his right to declare the contract at an end and to exclude complainant from taking any part in carrying out the contract with the county and from receiving any of the profits.

McCabe *v.* Sinclair.

He also declares by his affidavit that by agreement between himself and Kennedy the latter's prospective interests in the contract were abandoned and that he, Sinclair, is the only party interested.

The complainant does not ask for a receiver nor in anywise to stop or interfere with the execution and completion of the work under the contract with the county, but asks that an officer in the nature of a manager be appointed to supervise its execution.

The contention of his counsel in this respect is that the remedy by an action at law is inadequate, for several reasons:

1. He claims to be entitled to a share of the profits; and that the amount cannot be ascertained until the contract is completed; and that their ascertainment will require an intricate accounting which will be best had in this court.

2. That the defendants, both Sinclair and Kennedy, are non-resident; Sinclair being a resident of the State of Missouri and only temporarily resident in New Jersey.

He further urges that in taking an accounting of the completion of the contract, he, the complainant, will be at a disadvantage, because the defendant Sinclair will have the opportunity to so manage the business during the progress of the work that it will be difficult, if not impossible, to ascertain what the actual profits are.

On the main point I think the complainant's contention is reasonable. I agree with what Vice-Chancellor Grey said in *Cornell* v. *Redrow, 15 Dick. Ch. Rep. 251* (at *p. 254*):

"Suing at law before ascertaining whether there were profits, and to what amount, his claim would lack the elements of certainty which the law courts require. An accounting of all the transactions of the business would be necessary, and this the mode of procedure in those courts is unfitted to accomplish."

As complainant, if he succeeds in his present suit, cannot be placed on a lower basis of right than that of an employe whose compensation depends upon a share of the profits, he is brought within the principle of *Hargrave* v. *Conroy, 4 C. E. Gr. 283,* and the case of *Cornell* v. *Redrow, supra.*

Looking now into the affidavits:

It appears that the complainant is, and for many years has been, doing business as a contractor for public work in Jersey City, and that he is well acquainted with the facilities for and cost of doing such work; that he is also engaged in business with a Mr. McMenniman, of Jersey City, under the business name of the Union Stone Company, with its headquarters in Jersey City (the business of the firm apparently is to deal in building stone) ; that the specifications for building the road in question were on file in the proper office of the county, and advertisements were made by the freeholders for performing the work; that Sinclair was a comparative stranger in Hudson county, but desirous of making a bid for the work in question; that a conference was had between him and complainant, and more or less with Mr. McMenniman, representing complainant; that Kennedy was engaged in business in New York City in furnishing supplies, presumably tools and machinery used by contractors like complainant and Sinclair; that an agreement was made between the three that a bid should be made by Sinclair in his own name; that complainant should assist him in fixing the prices to be inserted in the bid (which was on a blank furnished by the county), specifying the rates per cubic yard for the different parts of the work; that complainant should furnish the necessary surety, first for the bid and afterward for the contract, if awarded to Sinclair; that each of the three should furnish one-third of the necessary working capital and share equally in the profits and losses, if any; that in pursuance of this contract complainant did furnish Sinclair with important information, necessary in order to make an intelligent and safe bid; assisted him in finding material for the necessary filling under the contract, ascertaining the cost of it, and actually assisted him in filling out the blanks in the printed form for the bid, which printed forms were furnished by the county officials; that he furnished what is called the "proposal bondsman," and also the names of two sureties, who severally signed and justified the printed affidavit annexed to the printed form of bid; and while the bid was under consideration by the board of freeholders, complainant, by his partner (McMenniman), on inquiry from one of the free-

holders as to the personality of Mr. Sinclair, the bidder, informed the freeholder that complainant was interested in Mr. Sinclair's bid.

After the bid was accepted, for some reason which does not clearly appear, the two gentlemen who justified as sureties on Mr. Sinclair's bond were not used for that purpose, but complainant introduced Mr. Sinclair to Messrs. Queen & Tennant, counsel in Jersey City for the National Surety Company of New York City, which company was authorized to act as surety in the State of New Jersey, and who (Messrs. Queen & Tennant) keep on hand blank applications to such company, to be filled out and signed by persons desiring the company to join as surety for the applicant on any bond or undertaking.

Up to this point there is little dispute between the parties as to the facts, but from this point on the dispute is radical.

The affidavits on the part of the complainant tend to show that, anticipating that the surety company would require a counter bond, or indemnity bond, he made arrangements with a Mr. A. H. Woodward, of Newark, New Jersey, a man of competent means, to become such counter surety to the surety company, and that when he went with Mr. Sinclair to the office of Messrs. Queen & Tennant he gave them the name of Mr. Woodward as counter surety, to be inserted in the blank left for that purpose in the application, and it was so inserted, and the application was otherwise filled out by the insertion, at Sinclair's dictation, of answers to certain printed questions put to him as to his means and responsibility; that the application was then placed in an envelope, addressed to the surety company and handed to Mr. Sinclair, who promised to go directly to the office of the surety company in New York City and make to it the formal application.

If he had done so, according to the regular course of business, the company would have taken the application into consideration and referred the question of responsibility of the proposed counter surety to their counsel in New Jersey, Messrs. Queen & Tennant.

Mr. Sinclair, however, did not take the application to the surety company, but, according to his own affidavit, then and

there decided to have nothing more to do with complainant, and with the aid of Mr. Kennedy made an application to and obtained surety on his bond from another company, and undertook the enterprise on his own account.

He swears that the complainant did not advance his share of the funds necessary to commence the enterprise. In point of fact there was no occasion to advance any until the bond was perfected and the contract signed; in point of fact no request was made to complainant to furnish any money.

There is evidence that inquiry was made of Mr. McMenniman, in behalf of Mr. Sinclair, whether complainant was ready to put in any money, and the reply was given in the affirmative.

It appears by affidavits on the part of the complainant that he was ready and willing to procure his friend, Mr. Woodward, to sign the counter surety bond, and was inquiring for two or three or more days of Sinclair, and also of Kennedy, the result of his visit to the National Surety Company, and was put off with evasive answers.

The excuse given by Sinclair for refraining from completing the application to the National Surety Company was that he was satisfied that the statement of his own pecuniary responsibility therein contained was so disparaging that the application would not be entertained. It does not state that he so informed complainant. I think the excuse is entirely insufficient. It overlooked, and in fact his affidavit ignored, the circumstance that the name of the proposed counter surety, or as it is called by counsel, an indemnifier, was named in the application, and it was his duty in justice to complainant to present the application and to put to actual proof the ability of complainant to furnish security.

It is significant in this connection that he found no difficulty in procuring a bond from another surety company without an indemnifier.

The conduct of the defendant in this behalf, as stated by himself and viewed in the light of other, either admitted or well-established, facts, raises a strong suspicion of bad faith on his part.

He had received and enjoyed the benefit of the great experi-

ence and superior knowledge of the complainant and of his friend McMenniman in ascertaining what figures it would be safe to name in his bid for the work, and also their assistance in inducing the board of freeholders to recognize him as a proper party to undertake the contract, and having obtained the contract, he, without any just cause that can be found, disclosed by the case, repudiated the contract with the complainant for a joint enterprise and attempted to exclude him from any participation therein.

This, it seems to me, gives the complainant a meritorious case and entitles him to the aid of this court.

Counsel for the defendant contends that there never was any actual partnership contract entered into between the parties, or that, if there were, it never became a partnership *in præsenti*. But I think the admitted facts in the case are against him.

The enterprise in which they engaged was not strictly a partnership, but simply a joint enterprise in which each was to furnish an equal amount of the working capital and devote his time and attention to its execution. There was a complete meeting of the minds as to the part each should take in the work, and the share each should have in the proceeds, and the burdens each should bear.

The defendant asserts that the right of the complainant to a share in the enterprise depends on his performing certain preliminaries, to wit, furnishing the bond. His duty to assist the defendant in procuring his bond is not denied by the complainant. But an important question in all these cases is, has the contract been partly performed, has the business been entered upon?

Now, a part of the business in this case was, first, to ascertain and agree upon a proper and safe bid to be made, and in this the evidence satisfies me that the complainant did his full share. Next, to see to it that the board of freeholders would find in Mr. Sinclair an acceptable bidder. In this complainant did his full share. Next, in procuring a proper bond to the board of freeholders. In this complainant did his full and proper share. This, in my judgment, was all partnership work, so that the parties actually entered upon the partnership business, and the complainant took part in it.

Now, under the circumstances, the mere fact that a contract in writing was never signed does not prevent the actual existence of the partnership, and the fact that the complainant did not, even if he had been asked, as he was not, furnish a share of the cash necessary to launch the enterprise is insufficient to destroy his interest.

The case of *Hartman* v. *Woehr & Stegmuller, 3 C. E. Gr. 383,* decided by Chancellor Zabriskie, is an instance of this kind; and the case of *Durant* v. *Rhener, 26 Minn. 362,* is also a striking instance.

In the Minnesota case it was agreed between D., W. & Company and R. that R. was to prepare ice for the southern market, and D., W. & Company were to furnish the money and were to go south and look over the market and ascertain whether it was safe to proceed, and after doing so wrote to R. to prepare the ice, but failed to furnish the money, though they were ready to do so when called upon, and R. proceeded to put up the ice and sold it at a profit of $2,500, and it was held, in an action for an accounting brought by D., W. & Company, that a partnership *in præsenti* was formed, and not one to begin on the sending of the notice and the payment of the money.

Sinclair, in his affidavit, complains that complainant was dilatory in rendering proper assistance in the procuring of a surety on his bond. The bill and affidavits do not disclose what the requirements of the law and the advertisements for bids were in that behalf, nor do they disclose the practice of the board of freeholders with regard to bonds; but the copy of the bid and papers annexed, which are annexed to the bill, indicate that the advertisement called for bonds, with two sureties, of the county of Hudson, in the sum of $15,000 each, and these, as I have stated, were furnished by complainant and duly justified as to their sufficiency on the blank annexed to the bid.

It appears by the affidavit of Sinclair that the first bond, which he presented when he signed the contract, was for $15,000, and that it was afterwards raised to $55,000. I understood, and it was stated at the argument, that this was done in pursuance of some rule of the state department regulating the disbursement of the state appropriation for county roads.

There are statements in the affidavits which indicate that the complainant ascertained, shortly after the bid was made, that a bond in a larger penalty than that mentioned in the advertisement would be required, and that his two sureties whom he had offered would not be able to justify in amount sufficient to meet it, and he looked about for a substitute in Hudson county, and finally adopted the plan of procuring a bond from a surety company and indemnifying that company in manner already stated.

This, it appears, occupied five days after the bid was accepted, and I infer that the bond should have been filed and the contract signed not later than the last of the five days, viz., August 11th, 1903. On the morning of that day Sinclair was furnished with the material with which to apply for and procure the bond of the National Surety Company.

It is quite clear, from the evidence, that Mr. Sinclair did not perfect his bond on that day, and that no advantage was taken of him on that account by the board of freeholders. In fact, it was stated by their counsel at the argument that it was not the practice of the board to enforce with strictness the time within which to file the bond and sign the contract.

The complainant disclaims any desire to interfere with the progress of the work and expresses his willingness and readiness to join with Sinclair on the original terms, paying his share of the working capital and doing his share of the work.

Expecting that Sinclair will decline this offer, as he does, complainant asks the court to appoint what is known in the books as a manager (*2 Lind. Part. (2d Am. ed., 1888) *545 et seq.*), with instructions not to interfere with the work, or with Mr. Sinclair's management of it, but to handle the receipts and attend to and audit the payments.

I am not sure that such an appointment would work any injury to the defendant or interfere with the completion of his contract, but it would be attended with considerable expense, and I propose and will advise an order which will avoid that expense and will, at the same time, I think, reasonably insure the complainant against any fraud that Sinclair may attempt to practice upon him.

McCabe *v.* Sinclair.

I will advise an order that the defendant shall submit to complainant, or to such attorney or agent as complainant may appoint, a list of all payments which he proposes to make before making the same, and give complainant an opportunity to make copies thereof. This list shall contain the names of the persons to whom payments may be made and .also the consideration for such payments. It will include, of course, a payroll of all laborers and employes,· and with it must be submitted the bills of all implements and materials purchased and repairs done, and generally give to the complainant such information of the details of the business as he would be entitled to have if he were an acting partner in the enterprise.

Such information must be given to the complainant as often as he may require the same, not exceeding once a week. In the absence of agreement between the parties, the information will be given at the office of one of the special masters of this court, under whose supervision the order will be executed.

It was admitted by counsel that the contract provided for the retention of twenty per centum of the contract price until the work was completed and accepted, and for the retention of five per centum, or one-fourth of the said twenty per centum, for six months longer, to answer any defects which might be developed by the use of the road in that time.

It seemed to be understood that the whole of that five per centum would probably be absorbed for that purpose, so that the only reliable amount retained was the fifteen per centum of the whole contract price.

If the profit on the contract turns out to be forty-five per centum of the whole contract price, complainant's one-third would be covered by that retained percentage, hence I see no reason to enjoin the receipt by Sinclair of the payments which shall be made in the due course of the execution of the contract, and the restraining order will stand as against his anticipating or assigning or in any way pledging the final payment of twenty per centum.